**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

BEND AESTHETICS & WELLNESS, LLC,
Plaintiff,

v.

BTL INDUSTRIES, INC,
Defendant.

**COMPLAINT**

Plaintiff BEND AESTHETICS & WELLNESS, LLC ("Plaintiff") files this Complaint against Defendant BTL INDUSTRIES, INC. ("Defendant"), showing in support as follows:

**NATURE OF THE CASE**

1. This is a civil action brought by Plaintiff against Defendant alleging several causes of action related to Plaintiff's purchase of medical equipment from Defendant pursuant to a written contract. The medical equipment at issue is marketed and sold by Defendant as the "EMTONE" and the EMTONE is intended to be used by medical doctors on human patients in medical, cosmetic procedures. Plaintiff purchased one of the EMTONE medical devices from Defendant for approximately $156,000.00 and financed the EMTONE through a third-party finance company. Unfortunately, after Plaintiff fully performed her obligations under the written contract by paying Defendant the purchase price of the EMTONE in full, Defendant delivered Plaintiff an EMTONE that *never* worked. In fact, the EMTONE was used on several patients of Plaintiff and each patient suffered physical injury from the EMTONE and the procedure the EMTONE was purchased to perform could not actually be safely performed on any patient, thus rendering the device useless. Despite Defendant having actual notice and/or knowledge that the EMTONE Defendant sold Plaintiff was defective, non-working (when it was delivered) and a

*danger to Plaintiff's patients*, Defendant has failed to and/or refused to provide Plaintiff with a working EMTONE device. Further, not only has Defendant materially breached the contract it entered into with Plaintiff, Defendant has also acted in "bad faith" in violation of the implied covenant of good faith and fair dealing that is a part of every contract in the Commonwealth of Massachusetts, thus willfully and intentionally depriving Plaintiff of the "benefit of the bargain" essential to the written contract at issue. Accordingly, Defendant's conduct here is more than just a material breach of the contract at issue here, Defendant's conduct is also a violation of Mass. Gen. Laws ch. 93A, §§ 2, 11. Due to Defendant's material breaches and violations Mass. Gen. Laws ch. 93A, Plaintiff has suffered great economic harm, including significant monetary damages that include contract damages, consequential damages, lost profits, damage to reputation and other damages, well in excess of $75,000.00 dollars.

## PARTIES

2. Plaintiff is an Oregon limited liability corporation duly organized under the laws of Oregon with a principle place of business in Oregon.

3. Plaintiff offers health care services to the public, primarily in Oregon and throughout the western portion of the United States.

4. Dr. Leslie Carey ("Dr. Carey") is the sole member of Plaintiff and Dr. Carey is domiciled in, and a resident of, the state of Oregon.

5. Defendant is a Massachusetts domestic corporation duly incorporated under the laws of the Commonwealth of Massachusetts and has a principal place of business in Marlborough, Massachusetts.

6. The written contract between Defendant and Plaintiff, drafted by Defendant, has a choice-of-law provision that requires that (i) Massachusetts law to be applied to any disputes

arising out of the contract at issue here; and (ii) that any such civil action arising out of any such dispute be filed in "a court in Boston, Massachusetts."

## JURISDICTION & VENUE

7. Subject matter jurisdiction is proper in this Honorable Court pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds well over SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) and the controversy is "between citizens of different States." To wit, Defendant is domiciled in and is a citizen of the Commonwealth and Plaintiff is domiciled in and a citizen of the state of Oregon.

8. This Honorable Court has personal jurisdiction over Defendant because it is a Massachusetts domestic corporation, with a principal place of business in Massachusetts, and regularly conducts business in Massachusetts.

9. Moreover, Plaintiff and Defendant agreed to submit to the jurisdiction of this Honorable Court pursuant to the terms of the written contract at issue in this civil action.

10. Venue is proper in United States District Court in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b)(1), as Defendant resides in and has a principal place of business in this judicial district.

11. This is a dispute between two (2) corporate entities and to the extent Plaintiff alleges a violation of Mass. Gen. Laws ch. 93A, §§ 2, 11, there is no presentment requirement.

## FACTS

12. Defendant is a medical equipment company that manufactures, markets and sells medical equipment to health care providers throughout the United States in the usual course of its business.

13. Plaintiff is a health care clinic that provides various health care services to its patients that focus on functional medicine, aesthetics and wellness to provide patients with long-term health, beauty and vitality.

14. Plaintiff offers several of these health care services through the use of various medical devices and/or medical procedures.

15. This medical equipment and /or medical devices are paramount for Plaintiff to be able to not only provide these health care services to its patients, but to also generate revenue, make profits, and operate as a commercial business.

16. At some point in 2021/2022, Plaintiff and Defendant engaged in discussions regarding Plaintiff's potential purchase of Defendant's medical device, the EMTONE.

17. Defendant represented that the EMTONE was a medical device that could be used on various parts of the body (*e.g.*, buttocks, thighs, abdomen, "love handles") to treat cellulite.

18. Defendant marketed/markets the EMTONE as "the first and only device to simultaneously deliver both thermal and mechanical energy, targeting all major contributing factors to cellulite." *See* www.bodybybtl.com.

19. Defendant further represents that "cellulite is a multifactorial condition affecting the skin, particularly on the thighs, hips, buttocks and abdomen" noting that it is "more common in women than men." *Id.*

20. With respect to what the treatment of a patient by the EMTONE would consist of, Defendant further represented, "[d]uring the first visit, your [health care] provider helps design your individual treatment plan [and that] [m]ost patients undergo 4 treatments… once or twice a week" and "[a] treatment takes about 20 minutes." *Id.*

21. In response to "what does the [EMTONE] treatment feel like," Defendant represents that an EMTONE treatment is "similar to a hot stone massage with intense mechanical vibrations." *Id.*

22. Under the "Important Information" section, Defendant represents that, "[y]ou [the patient] may feel intense heat, but during the treatment, but you should not feel an unpleasant sensation of burning or pain." *Id.*

23. These same representations were made to Plaintiff by Defendant and are also in the EMTONE literature Defendant provided Plaintiff while marketing the EMTONE to Plaintiff.

24. At some point in 2022, Defendant and Plaintiff entered into a written agreement for Plaintiff to purchase an EMTONE device from Defendant for approximately $165,000.00.

25. Plaintiff needed to finance the EMTONE purchase from Defendant through a third-party, and Defendant was aware that Plaintiff was financing the EMTONE through a third-party finance company.

26. Plaintiff needed the EMTONE to work properly in order to provide the corresponding treatments to patients and pay for the EMTONE itself.

27. At some point in April 2022, Defendant delivered the EMTONE to Plaintiff's office in Oregon—it delivered without associated supplies necessary for it to function.

28. Approximately one week later the associated supplies needed to operate the EMTONE were delivered.

29. Because the EMTONE is a medical device used on human patients, Defendant required formal training by one of its agents, a registered nurse ("RN") before the EMTONE could be used by Plaintiff.

30. Approximately one month after delivery of the EMTONE, at some point in late May 2022, Defendant conducted training of Plaintiff's staff (Dr. Carey included), on how to properly use the EMTONE machine. The training was conducted and the EMTONE was used on a patient.

31. Unfortunately, two (2) patients were injured by the EMTONE machine during treatment (they were scratched on their respective treatment areas) and both patients suffered physical injury and endured pain to an uncomfortable level.

32. The treatment was stopped—this was the first time the EMTONE was used.

33. Defendant was aware of the injuries to these patients caused by the EMTONE not working properly and Defendant told Plaintiff that they would fix the problem and Defendant sent a replacement "hand piece" (the part of the EMTONE that essentially is used to physically apply the EMTONE to the patient).

34. Between May and July 2022, the EMTONE continued to injure patients and was practically non-functional—it could not be used without injuring patients—the EMTONE had yet to work properly.

35. Defendant had notice of the continued problem of the EMTONE injuring Plaintiff's patients and re-schedule a training of Plaintiff personnel for some point in July 2022.

36. At some point in late-August or early-September 2022, Defendant conducted another in-person training session for the EMTONE at Plaintiff's Oregon clinic.

37. The trainer was an RN-agent of Defendant and during this training session another patient was injured/scratched by the EMTONE—this treatment was being administered by Defendant's RN agent.

38. During this session, Defendant's agent also stated she observed an unusual pattern of power loss and/or pauses and Defendant's RN-agent submitted an internal complaint on behalf of Plaintiff to Defendant in which she recommended the defective unit be evaluated and replaced.

39. Defendant took the original, defective EMTONE that had never worked properly back at some point in August or September 2022 and sent Plaintiff a "loaner" EMTONE in September 2022, while Defendant evaluated the defective EMTONE it sold Plaintiff.

40. Unfortunately the "loaner" EMTONE had the same issues as the original, defective EMTONE and it also injured/scratched patients of Plaintiff.

41. At some point in late September / early October 2022, Defendant sent back the original, defective EMTONE to Plaintiff without providing any information—the EMTONE just "showed up" one day.

42. It was clear the EMTONE delivered was the same defective EMTONE Defendant originally sold BA&W that had never worked—it looked like the hand piece was replaced—something that had already been done several times and that never fixed the problem.

43. At some point in October 2022 Plaintiff used the EMTONE that Defendant sent back, but the same problem persisted—a patient was injured/scratched when Plaintiff's personnel applied the treatment. The EMTONE still did not work.

44. Defendant told Plaintiff that it would not replace the defective EMTONE with a new EMTONE because it was "unreasonable" to replace the defective EMTONE because Plaintiff had the EMTONE for six (6) months.

45. This was despite Defendant selling Plaintiff a defective EMTONE that *never* worked.

46. There is a warranty in the written agreement applicable to the defective EMTONE that states, "[Defendant] warrants to Customer [Plaintiff] only that the equipment [EMTONE] will be free from defects in material and workmanship which [Defendant] determines in the exercise of its reasonable judgment impairs the ordinary use of the Equipment [EMTONE]."

47. Plaintiff was unable to use the defective EMTONE because it was afraid to use the EMTONE as it would—and as it had previously—injure its patients and negatively impact Plaintiff's reputation in the medical community and its patient community.

48. Despite Defendant refusing to honor the warranty and provide a working EMTONE that did not injure Plaintiff's patients, Dr. Carey continued through the end of 2023 and into 2024 to file complaints with Defenant in an effort to have the defective EMTONE replace.

49. At some point in early 2023, when Dr. Carey directly asked the Defendant's salesperson who sold the defective EMTONE to Plaintiff if Defendant could replace the defective EMTONE with a new, working EMTONE as Plaintiff was not able to use the defective EMTONE, was not making any money in connection with EMTONE treatments, and that Plaintiff was paying almost $4,000.00 for a medical device that never worked, Defendant responded that it would not replace the defective EMTONE—Dr. Carey was told replacing the defective EMTONE, that never worked, "was not possible."

50. Defendant simply refused to do anything to honor the warranty in the written agreement.

51. To this day, the defective EMTONE has never worked.

52. Unfortunately, Plaintiff continued to be liable to pay off the $156,000.00 it had borrowed to finance the defective EMTONE, but the defective EMTONE has generated $0.00 in revenue for Plaintiff as it has never worked.

## FIRST CAUSE OF ACTION
**Breach of Contract**
**(Plaintiff against Defendant)**

53. Plaintiff incorporates by reference each and every preceding paragraph as if fully restated herein.

54. There is a written contract between Plaintiff and Defendant wherein Plaintiff agreed to pay Defendant approximately $156,000.00 in exchange for Defendant providing an EMTONE medical device to Plaintiff.

55. Plaintiff fulfilled all of its obligations under the written contract as it paid Defendant the approximate $156,000.00 using a third-party finance company.

56. Plaintiff intended to use the EMTONE to provide the health care treatments to Plaintiff's patients—treatments that Defendant represented the EMTONE would perform.

57. Unfortunately, Defendant delivered a defective EMTONE to Plaintiff that never worked and has never worked to this day.

58. The defective EMTONE has injured several patients of Plaintiff.

59. Defendant was aware of the defective EMTONE not working and injuring Plaintiff's patients, but it failed to either replace the defective EMTONE or repair it to a condition for its intended purpose.

60. Accordingly, by delivering a defective EMTONE that has never worked and by failing to honor the express warranty in the written contract, Defendant has materially breached the written agreement, depriving Plaintiff the benefit of the bargain it contracted for with Defendant.

61. Defendant's breach of the express warranty in the written contract is a violation of Mass. Gen. Laws ch. 106, § 2-313.

62. Further, Defendant is a direct "seller" of medical devices, including the EMTONE, the and the defective EMTONE it sold Plaintiff was not fit for the "ordinary purpose" for which it was intended—indeed, the defective EMTOBE never worked and injured several of Plaintiff's patients.

63. Accordingly, Defendant breach the implied warranty of merchantability when it sold Plaintiff the defective EMTONE in violation of Mass. Gen. Laws ch. 106, § 2-314.

64. Defendant also warranted that the EMTONE could be used to treat Plaintiff's patients for particular medical purposes, but the defective EMTONE was not fit for these intended purposes as not only was it defective, it also injured Plaintiff's patients when it was used.

65. Accordingly, Defendant breached the implied warranty of fitness for a particular purpose when it sold Plaintiff the defective EMTONE in violation of Mass. Gen. Laws ch. 106, § 2-315.

66. As a direct result of Defendant's breach of the written contract, and as a direct result of Defendant's breach of the implied warranty of merchantability and implied warranty of fitness for a particular purpose, Plaintiff never received the benefit of its bargain, and has suffered substantial pecuniary loss, including, but not limited to the monies to finance and pay for the EMTONE machine, lost profits, and other monetary damages, in addition to damages to Plaintiff's reputation and good will.

67. These damages were proximately caused by Defendant's conduct.

**<u>SECOND CAUSE OF ACTION</u>**
**Violation of M.G.L. ch. 93A, §§ 2, 11**
**(BA&W against BTL)**

68. Plaintiff incorporates by reference each and every preceding paragraph as if fully restated herein.

69. Defendant is a Massachusetts domestic corporation with a principle place of business in Massachusetts.

70. Defendant manufactures, markets, and sells medical equipment throughout the United States, this includes the EMTONE medical device at issue in this case.

71. Plaintiff is a limited liability corporation that offers health care services to the public primarily in Oregon and in the western part of the United States.

72. At some point in 2022, Defendant and Plaintiff were engaged in trade or commerce and Defendant marketed and sold an EMTONE device to Plaintiff that Plaintiff intended to use to treat its patients.

73. There was a written sales contract for the sale of the EMTONE device by Defendant to Plaintiff.

74. The written sales contract had an express one-year warranty concerning the EMTONE wherein Defendant warranted that the EMTONE it sold Plaintiff would "be free from defects in material and workmanship which [Defendant] determines in the exercise of its reasonable judgment impairs the ordinary use of the [EMTONE]."

75. Moreover, every written contract in Massachusetts has an implied covenant of "good faith and fair dealing" wherein the contracting parties are obligated to not engage in conduct that deprives the other party "the benefit of the bargain" the party contracted for in the written contract.

76. Nonetheless, when Defendant was: (i) immediately made aware of the defective EMTONE it sold and delivered to Plaintiff; and repeatedly (ii) failed to fix or replace the defective EMTONE even when never worked properly and was injuring Plaintiff's patients; Defendant violated the express warranty in the contract as Defendant failed to exercise "reasonable" judgment and replace the defective EMTONE as the defects in the EMTONE clearly "impair[ed] the ordinary use of the [EMTONE]."

77. Moreover, Defendant's refusal to honor the express warranty and or act in good faith to replace the defective EMTONE despite having actual knowledge that the EMTONE was defective *ab initio*, injured Plaintiff's patients, never worked, and thus deprived Plaintiff the "benefit of its bargain" (Defendant was aware Plaintiff financed the EMTONE, was making $4,000.00 monthly payments to a third-party lender and was not able to generate any revenue from the defective EMTONE), in violation of the covenant of good faith and fair dealing.

78. Defendant's conduct in this business transaction is unfair and/or deceptive and in violation of Mass. Gen. Laws ch. 93A, §§ 2, 11.

79. Defendant's unfair and/or deceptive conduct has directly and proximately caused Plaintiff actual economic loss, including the monies paid to the third-party finance company to pay for the $156,000.00 EMTONE, consequential damages, including lost profits, attorney's fees, and other monetary damages, in addition to damaging Plaintiff's reputation and good will.

## **DAMAGES & PRAYERS FOR RELIEF**

80. Plaintiff prays for the following relief as against Defendant:

a. All damages allowed against Defendant for its breach of the sales contract at issue in this matter and all other consequential damages that were directly and proximately caused by Defendants' breach;

b. All damages allowed pursuant to Mass. Gen. L. ch. 93A, including treble damages, costs and attorneys' fees;

c. Pre-judgment interest;

d. Post-judgment interest; and

e. All other relief this Honorable Court deems just and reasonable.

Respectfully submitted,

Plaintiff,

BEND AESTHETICS & WELLNESS, LLC,

By its attorneys,

Edward C. Cumbo (BBO No. 661284)
*e.cumbo@rc-llp.com*
Robert Richardson (BBO No. 676947)
*r.richardson@rc-llp.com*
RICHARDSON & CUMBO, LLP
101 Federal Street, Suite 1900
Boston, MA 02110
Tel: (617)217-2779

DATED: September 25, 2026